I will try to keep an eye on the clock and reserve two minutes for rebuttal. This was a close case. Ms. Flores gave a plausible, largely uncontradicted account of her innocence and the first trial resulted in a hung jury. But during the retrial, the government unfairly tipped the scales against Ms. Flores by engaging in repeated acts of misconduct. First, it vouched for the credibility of its expert witness, the only witness at trial whose testimony directly contradicted Ms. Flores' story. Second, it twisted Ms. Flores' testimony and misstated the law by telling the jury that because Ms. Flores had admitted to bringing marijuana into Mexico, she was guilty beyond a reasonable doubt of importing marijuana into the United States. And finally, the prosecutor shifted the burden of proof by telling the jury that because Ms. Flores presented a defense, the jury was entitled to evaluate her defense the same way as it did the case put on by the United States, thereby undermining the presumption of innocence to which Ms. Flores was entitled. These errors were not harmless. In a close case, their combined effect rendered Ms. Flores' defense far less persuasive than it would have been absent the misconduct, and it made it likely that the jury convicted Ms. Flores for conduct. Why was it a close case? Why was it a close case, Your Honor? The first trial, well, here we have the benefit of not having to guess how close the case was because there were two cases. The first resulted in a hung jury, and the cases were largely similar. There was one credibility witness put on by Ms. Flores who was not put on in the second case, and Ms. Flores presented an expert witness on her behalf in the retrial. Juries hang up for a number of reasons. That is true. But here the only issue, Your Honor, was Ms. Flores' credibility, and she testified in her own defense in the first trial, and the jury did not find her incredible. They were unable to reach a unanimous verdict, but during the second trial, because of the misconduct that the government engaged in, that undermined her credibility. It was a circumstantial evidence case. There was no direct evidence of Ms. Flores' knowledge, and her credibility was key. And here, by vouching for its expert witnesses and really twisting her testimony. The vouching part, I would say, doesn't impress me all that much. What do you say? You said, you know, I thought this witness was better than that witness. Isn't that what you said? Yes, Your Honor, but this was the only witness whose testimony directly contradicted Ms. Flores' story. Do you think the jury was really influenced when somebody says, you know, if it was up to me, I'd believe this guy, not that guy? When the prosecutor says, I would believe, I would hire this expert witness, because this expert witness is experienced and not the expert put on by the defense. I think that places the weight of the record in terms of their relevant experience, relative experience. I believe they had similar experience. Mr. Folk, Ms. Flores' expert witness was a professor, did more teaching than actually hands-on mechanical work, whereas the government's expert ran a mechanical shop. It was whether the air conditioning had been fixed. Right. That was the significant issue at trial, because Ms. Flores testified that she went to Mexico to have her air conditioning replaced, the Freon in her car replaced, so that her air conditioning would be working. And her expert said it's likely that it was replaced and it would have been working when she had her car returned to her. However, the government's expert testified the opposite, that based on his evaluation of the car, it's unlikely that the air conditioning would have been working at the time she got her car back. So that was crucial, and it did undermine her story. And that was up to the jury to decide who was credible. They looked at the car. What was that? Soon after. So it was all kind of very vague, anyway, because things could have broken in the meanwhile and so on. Absolutely. That is correct, Your Honor. But here, because it was based on circumstantial evidence and that was the only witness who said Ms. Flores' story is not true. But I would like to hear more about the smuggling. Yes, Your Honor. Absolutely. This was very pervasive. The government began its case by saying this is a simple smuggling case. And then during its cross-examination of Ms. Flores, it blurred the line of her testimony, which is that she brought marijuana with her into Mexico, by characterizing it as between. During cross-examination, eight times the prosecutor asked, you carried pot in your car between the United States and Mexico. You actually told someone you were carrying pot between the United States and Mexico. The day of your arrest, you were bringing marijuana between the United States and Mexico. And no, no, no, it was from? She did originally. She said no, into Mexico. She clarified the record. But after a while, I mean, with the numerous repetitions, she said, yes, I did. I did. Because that's, strictly speaking, accurate. However, it was blurring the testimony, and that was something that was later exploited during the closing argument, when the prosecutor said she admitted she smuggled drugs. This is a simple drug smuggling case, and she admitted to you. She admitted to you she was a drug smuggler. You heard her admitting to you she was a drug smuggler. Why did she want her cousin to delete the evidence? As she said, she wanted to delete evidence of her drug smuggling. And then at rebuttal, which is the most egregious, when Ms. Flores did not have an opportunity to do that. She never said that. She never said she wanted the cousin to delete evidence of her drug smuggling. She did not. That was a mischaracterization of the evidence. In any direction. Right. That is correct. And then in the rebuttal argument, the prosecutor said, Ms. Stewart may want you to forget about the fact that her client got up there and said she was a drug smuggler. You heard her. She claims she smuggled drugs from the United States to Mexico. That's still smuggling drugs. And your memory should include the fact that she admitted she's a drug smuggler. And finally, tying it all together with the government's burden of proof, she knows she was smuggling drugs on June 21st, 2012. You heard her say that repeatedly. And that's why she's guilty beyond a reasonable doubt. The timing of that, that was the last thing that the jurors heard before they went to deliberate. And the timing increased the risk of influencing the jury and prejudicing the outcome of the trial. A confession is one of the most convincing forms of evidence. And here the government twisted Ms. Flores' testimony into a confession of the crime charged, when this was not the crime charged at all. So what was the vouching again? The vouching, Your Honor, is when the government said, I want you to ask yourself which of those two gentlemen, as between the two mechanics, the expert witnesses, would you hire to work on your car and then judge their testimony? I submit I would hire Russ Butler, the government's expert, to work on my car rather than Forrest Folk. Russ is experienced. The implication there being that Ms. Flores' expert witness was not experienced and his testimony should not be trusted as credible. Any other vouching? That was the only instance of vouching. All right, the misstating the law and then undermining the burden of proof, where the government said it had articulated a very reasonable explanation for what happened that day, which was in the closing, and that because Ms. Flores put on a jury, was entitled to evaluate it the same way as the United States. Where certainly that's true of a witness's credibility or the evidence. As the case in whole, that's not true. The government had the burden of proving its case beyond a reasonable doubt, and Ms. Flores was entitled to a presumption of innocence, and that was undermined by the government's statements at closing. In addition, during closing, there were over five pages, I'm sorry, not in closing, five pages of cross-examination as to why Ms. Flores and her entire defense team did not produce evidence of Juana Mechanic. And in closing, the prosecutor said that she anticipated Mr. Barr or Ms. Stewart was going to try to get up here and prove, despite what happened in Mexico, and despite the lack of evidence, that she didn't know drugs were in the car. That was not Ms. Flores' burden. She did not have the burden to prove her innocence. And it materially affected the outcome of the trial. Here, the jury. That's very complicated because they put on evidence that she didn't, some evidence. They put on evidence that she was looking nervous and she was looking in a certain way, and besides, how could she not know, and so on. So they did put on some evidence that she knew or the circumstantial evidence that she knew. So the comment that she didn't prove that she didn't put on any evidence that she didn't know was just simply, I mean, that's why these things get very difficult, because by noticing that, she's saying, and we put on some evidence that she did know, and she didn't put on any evidence that she didn't know. So you should regard our evidence as sufficient because there's nothing contravailing. Well, here, Your Honor, there was something contravailing. Ms. Flores testified in her own defense, and she gave a very plausible account of innocence, that the first jury did not find that the government had met its burden until the government resorted to misconduct, and then. That's a different point. I mean, and from this question of the burden to prove question, well, I guess you're calling it part of the misconduct, but it's much more technical and theoretical than as to how it would actually affect your jury in this other piece about the smuggling, it seems to me. I think that's correct, Your Honor. I think that's why we look at all of the misconduct as a whole in the context of the entire trial. Here, the strength of the government's case was weak. There was no direct evidence. It was based entirely on inference. And here, the misconduct pervaded the entire trial. It was in the cross-examination of Ms. Flores and in both of the government's closing arguments. And it culminated in the prosecutor's final words to the jury, which was that she admitted to this, and that's why she's guilty beyond a reasonable doubt. Here, it is very likely that the jury misunderstood its task in the law because the prosecutor told it what the evidence said and how to interpret that evidence. And that wasn't true. That wasn't Ms. Flores' testimony. That wasn't the law that she was charged with violating. And the prejudice is high. Were there objections made all along? Some of the misconduct was objected to, Your Honor. Some of it was not. So we're asking the Court to view the cumulative effect of the errors here and whether or not they substantially affected Ms. Flores' right to a fair trial. I'm sorry? What was objected to. What was objected to, yes, Your Honor. The burden shifting was objected to. The vouching was not. Impugning her character and credibility was objected to. The offstand, the introduction of evidence not in the record. The government concedes the vouching, right? The government does concede the vouching. However, it says that it does not rise to the level of plain error. However, we disagree. We think that it did substantially affect Ms. Flores' right to a fair trial, especially when viewed with all the acts of misconduct in the context of the entire trial. I will, unless the Court has any further questions, I will reserve the rest of my time for rebuttal. Thank you. May it please the Court. Sabrina Pfeffer, United States. Judge Berzon, I want to start with a question you just asked Ms. Stewart. You said to her, Ms. Flores never, she didn't say anything about wanting to delete messages. Ms. Stewart said yes. That is incorrect. Talk slower, please. I shall, Your Honor. If you look at ER 85. Anything about wanting to delete messages? Yes. If you look at ER 85, and thank you for the reminder, you'll see that I asked her, right after the direct, where she told Ms. Stewart's co-counsel, all I wanted to delete was a possible picture of me possibly smoking marijuana. I got up and I said, let me read it to you in fact. What I said to her was, there was other evidence in your Facebook account that you would have reasonably wanted destroyed, wasn't there? Answer, yeah. There were private messages. And so I began to walk through those private messages with her. Later, she backed away from it because she understood what she was in fact admitting. The statement was that she said that she asked him to delete messages about her smuggling marijuana. No, Your Honor. On direct, what she said she asked him to delete was a picture. What she was reading from the closing, and I don't have it in front of me at the moment, was much more specific than that. I understand. But when she answered your question, is I understood it. Well, I understood it otherwise. Okay. Well, as long as we're on the same page. I want to make it clear. All right. Why, I mean, I will tell you now that the piece of this all that really bothers me is the repeated statement. Well, starting with the cross-examination, which did blur this thing about which way was she carrying the marijuana, which made a huge difference. And then, I mean, it was positive. And then the repeated statements in the closing argument, and particularly in the rebuttal argument, that she admitted that she was a drug smuggler and that that's the basis on which she should be convicted, and particularly the very last statement, which is totally incorrect, that she admitted that she was a smuggler and that's why she should be found guilty beyond a reasonable doubt. Your Honor, I have picked up from this morning that you do not like it when we do not give you a direct answer. So I want to make sure I understand your question because it sounded like there were three different parts. My question is, why isn't that arguing to the jury erroneous facts and an erroneous legal rule? Okay. I'll start with the... It would have been dispositive in which the very last thing that was said. All right. I'll start. I'm going to break it down into why it was both legally correct and also why it was factually correct. As far as why it was legally correct, it starts with the fact that Ms. Wasserman, in her closing and in her rebuttal later, but particularly in her closing, correctly stated the elements. She said, quote, defendant knew she brought marijuana from a place outside into a place inside the United States. She repeated that. That was on ER 111. She repeated it on ER 112. She also said at the very end, she knows that she was smuggling drugs on June 21st. You heard her say that repeatedly. Now, I mean, I don't think she ever said I was smuggling drugs, but insofar as she said that, she said I was bringing drugs from the United States to Mexico, and that's why she's guilty beyond a reasonable doubt. Totally wrong. But, Your Honor, I disagree with you, and I want to make sure, like I said, because I want to be responsive. As far as the argument there was any misstatement of the law, if you look at ER 113, ER 115, ER 129, each time she is emphasizing that the government's position is that Ms. Flores brought drugs from Mexico to the United States. And she is tying that in not just to the Facebook posts, but also about to her nervousness. That's on 115. She says she was nervous on June 21st because she knew she was smuggling drugs into the United States. She ties it into the jail calls. Are you talking about the cross-examination now? No, I'm talking about the closing argument, because that was what I understood you to find the most egregious. So I'm talking about ER 113, ER 115, and even with regard to the jail calls, she says, why on earth the day after being arrested after smuggling drugs into the United States would she call Jose Manuel and ask him to delete the evidence? So, again, every time she's arguing a point, it is with regard to evidence that Ms. Flores brought drugs from Mexico to the United States. Now, as far as— It's not every time, because many times it was the other way around. No, Your Honor. She never argued. In fact, the government disputed throughout the trial that Ms. Flores brought drugs from the United States to Mexico. And when you read my closing, it's clear that I—and I can tell you that it's clear because I'm the one who did it— am trying to press her on the fact that she is stuck with two Facebook posts that she was not able to delete. Your closing or your cross? I'm talking about my cross right now, because Judge Berzon referred to it, and all the sites I'd given to her were simply from the closing. But with regard to what you were saying about what happened on the cross-examination, there, she's stuck with the fact that, yes, I wanted to delete personal messages, and so we go through them, and both messages do not state from the United States to Mexico or from Mexico to the United States. It is clear from my line of argument, which is inferred from the questions, that I am pressing her to admit that, in fact, the people she was talking to, it was with regard to talking about bringing drugs from Mexico to the United States. And, in fact, when you go to the closing and you read Ms. Wasserman's response to the argument that Ms. Flores was, you know, making and which Ms. Stewart made, in fact, in her own closing, which was Ms. Flores only takes drugs from the United States to Mexico and not the opposite way, Ms. Wasserman says that that's a preposterous story. And the point is that—and she even uses evidence from the record to illustrate why it makes no sense. She said, you heard from Agent Flood. He told you drugs are cheaper in Mexico. Why would you bring drugs from a place where they're more expensive to a place where they are less expensive? And the point about what her admissions were, it was because she was stuck with those two Facebook records, and then she tried to explain it away. But even she could not explain away the fact that, yes, there are two messages out there that clearly show on the day of my arrest, I was carrying drugs in my car across the border. We always argue that the border, the direction she was going was from Mexico to the United States, and she was trying to explain away those damning messages. Okay. And what about — I mean, I'm — you yourself gave the rebuttal argument, is that it? No. Ms. Wasserman both did. I see. Okay. I only did the cross. I see. All right. In the rebuttal argument, the — I'm having trouble, unfortunately, finding. But, I mean, the very last statement, which was read before, would you like to explain that? Yes. I think that what you see there is the coda to the closing, which was approximately 11 pages in the closing and three and a half pages of the rebuttal. And what you see is a prosecutor referring back, and without rehashing and restating everything she has said, inelegantly, but still nonetheless accurately and legally correctly — It's not accurate, though, because she said she was a smuggler, you can find your guilty beyond a reasonable doubt, because she said the opposite. Your Honor, she did — she did — even Congress says, at least if you look at 18 U.S.C. 554, we would never argue that because she exported drugs, she imported drugs. But the fact is, when you are taking contraband across the border, both common sense and Congress have both said that it's still smuggling. Now, again, we never argued that — Is that a crime? It is a crime, Your Honor. But it's not the crime that she was charged with? No, and we were not arguing that it was the crime that she committed. It's not true that because she — you heard her say repeatedly that she was smuggling drugs on June 21st, when she was — what she was saying was she was taking the drugs from the United States to Mexico. That's why she's guilty beyond a reasonable doubt. That's wrong. Your Honor, I'm going to tell you why I think it's wrong, and then if you want to press me further, I'll do my best I can to answer your question. Pardon? Why you think it's right. Thank you, Judge Wardlaw. Yes. Ms. Flores, on the stand — because, again, we have to remember, we actually never introduced the Facebook records to the jury. All we did was to use them to cross her. So, really, it was her testimony that we were always referring to and not the Facebook records. But what she got up there and said is that, yes, on the day of my arrest, I told a man named Mr. Vidal and I told a man named Mr. Seja, I told both of them on the day of my arrest, come over and have a smoke of what I'm bringing or what I have. There was quibbling as to which — what the verb was. But the fact is, her own testimony was, yes, on the day of my arrest, I was inviting people to come smoke something that I had brought across the border. She had to admit that because she knew she couldn't get away from those Facebook records. Is that why she's guilty beyond a reasonable doubt? No. It's part of why she's guilty beyond a reasonable doubt. It's not at all why she's guilty beyond a reasonable doubt. There are many facts that were put before the jury. Again, those facts were all summarized in the cross — excuse me, not in the cross, in the closing and in the rebuttal. Your Honor, I submit that that last sentence is a prosecutor running out of steam. We're having catalogued the evidence. It's a prosecutor kind of overreaching, but explain to me why, since it's a plain error review, and there was no objection to that, why it's not — if it's error, why it's not plain error? Your Honor, I believe it's not plain error because there's no controlling case that says, if you are making what could be a reasonable inference from the record and you are arguing it, that you do not have the leeway to do so. Because my understanding from the case law is that it's very clear we're allowed to argue inferences from the record. I understand that the defense argued different inferences, but this is not a case where we're referring to anything outside the record or where we're fabricating evidence. And, in fact, both in her closing and on her rebuttal, Ms. Wasserman — But you're not inviting the jury to say because she smoked, she agreed that she brought — I mean, not inviting, telling them that because she agreed that she brought drugs from the United States to Mexico, she was guilty beyond her reasonable doubt of the charge. No. And, Judge Wardlaw, I promise to return to your question. But no, she is not, because throughout her closing she has specifically denied the credibility of the story that the drugs went from the United States to Mexico. So she is not arguing that because that is to say that you should completely disregard everything that she said, where she said over and over and over, Ms. Flores, the story doesn't make sense. But she also said in that same rebuttal, you heard her sitting up there on the stand and admitting to you that she was a drug smuggler. She claimed she had smuggled drugs from the United States to Mexico. That's still smuggling drugs. It is, but she goes on to say earlier in the closing she quibbled with the direction. And the point that Ms. Wasserman is making there, again, and we said this in our brief, was that it was a rhetorical flourish. Her point is even Ms. Flores can't wriggle out of the fact that she's stuck saying, yes, coincidentally, on the day of my arrest, I'm carrying drugs in my car across the international border, but I have to say something to get out of trouble, so I'm going to come up with this implausible story that it just so happens that I'm the only person who smuggles drugs the opposite way. But returning to Judge Wardlaw's question, I've tried to address why I don't believe that there was plain error, but even if there was. You said why it wasn't error. Your argument is it's a legitimate inference to be made and argued from the record. And then the fallback argument to that would be if there was error, it was harmless because Ms. Stewart and I strenuously disagree about whether or not this was a close case. Here there was ample evidence put on in the government's case in chief, and then Ms. Flores did herself no favors by getting up, taking a stand, and telling a story that most people with ordinary common sense would find implausible, which is if you have a car that you have bedecked and bedazzled with zebra seat covers and pink steering wheel covers, and it's very well taken care of, so taken care of that the secondary inspector remarked upon the fact that he was surprised by how old it is, you don't go down to Mexico and give your car to a mechanic who has no last name, no phone number, no known address, and you have no means of contacting him. And if you do go down to Mexico to see the mechanic and the dermatologist, when you get to primary, you don't tell the primary officer, I went to the dermatologist and leave out the mechanic. The point was there was strong, direct, and circumstantial evidence in the case in chief, and then when she put on her own case in chief, it backfired. I see that I am running close to my time, and I know that you've had a long day. Are there direct questions you want me to address? Is your position that the scope of the subpoena and the search were conducted entirely consistent with CDT? Your Honor, there was no subpoena, so we would only be arguing about the search warrant. And you took her account all the way back to the age of 10. I believe, Your Honor, that she was, that's not how the math works out, if I believe. She was 23 on the day of her arrest, and she testified that she had had it since she was 17, so I think it was six or seven years. Okay, but you got her entire account? Yes, we did, Your Honor. We did. And I know in the concurrence that Judge Kaczynski has a number of suggestions for how he would like us to do our searches, but in this case, we believe that we demonstrated probable cause to go into the entire account, and it was relevant in part because one of the items we sought in our attachment B was evidence of custody and control. And one of the things you will often see is that people are more cavalier about demonstrating their custody and control earlier on when they're using these accounts, especially if they're using it for an illicit purpose. And here, one other thing to look at in the record is that one of the admissions she made was that she had her almost all of her communications with her cousin Jessica on Facebook. We never found those records. And so as much as, you know, Ms. Stewart keeps telling you the government, you know, found everything and nothing was deleted, there's evidence in the record to suggest otherwise. But the other point about the search warrant and the Facebook is that, frankly, under Havens, which is a 1980 Supreme Court case, which I'm sure you're all familiar with because I think you've each cited it at some point in the past, that case holds that we can use evidence that was suppressed because it was the fruit of a warrantless or improper search on impeachment and cross-examination. Here, I would submit that all of the Facebook arguments are moot because we never actually introduced the evidence. And even if there was something wrong with the search warrant, and even if we didn't have good faith, the fact is because we actually never introduced anything, everything that we did with the Facebook records was completely proper. But the disturbing part is that the government still has had and has, as I understand it, all of her Facebook records for six years. And then that's the disconnect for me about this whole problem, which is I don't particularly have a problem with what you did at the trial, but how do people project themselves or how could she project herself against the fact that you now have everything else she did for six years? Your Honor, what you see in Agent Enrique's declaration is that after we completed the search and seized 100 records, the remaining disks, the disks with the remaining evidence Somebody looked at them all. A government person looked at them all. Yes, Your Honor. And the fact is, whether I go into a house or a car or, as the Court is very sensitive to, an electronic device You're not arguing plain view, are you? No. Not at all. I don't, and I'm not getting anywhere close to plain view. What I'm trying to do is address Judge Berzon's, what appears to be anxiety, which is when you go into We don't have anxiety. You've got the anxiety. Well, you said it's troubling. When you say something is troubling, I apologize if I overreact by saying that that seems anxiety. It's legally troubling. You know what I think the problem is? You keep pushing the envelope, huh? When you don't have to. No, Your Honor, that's not fair. That is totally not fair. That's the way I view it. How did I push the envelope? I'm not going to tell you. Well, that seems unfair, too. That is not fair. All right. All right. But that's what I find with your office. Yes, you have mentioned that repeatedly. Yes. Yes. And that's the sentiment that's out here. The suggestion is You want me to go through it? Your Honor, what I would ask is that, you know, you sit up there with your black robe, and you have to call the balls, and you have to call the strikes, but each time we come up to you, we come up to you on a record that is this case. And you have asked me very few questions today, but it seems like you're just waiting to tell me about other cases and other things my district has done. I can try each case to the best of my abilities, and I can come up here, and I can face you, and I can defend it. But I would ask you to adjudicate this case on its merits without necessarily feeling the need to, as you mentioned, you are more than willing to do, kind of catalog the series of events that you are unhappy with. I think we're off track. Get back to the legal issues. I'm not unhappy with them. You ought to be unhappy with them. I apologize, Your Honor. You know, you're kind of a smart ass, too, as you're out there, you know, and not very respectful. I, Your Honor, I deeply apologize. I intended absolutely no distress. You don't have to apologize. And that's what you do. You push the envelope. And you don't need to. You don't need to. And one of your problems is that you've got the FPD down there. They're very highly skilled lawyers. And they're frustrated by this whole system we have, where all the power is in the hands of the U.S. Attorney's Office and the young assistants. It shouldn't be there. That's the big problem that we have. In any event, my concern is that the breadth of the search can happen in a computer situation. And the Supreme Court, as you know, is extremely concerned with the amount of material in electronic media. The breadth of the search is different than going through somebody's drawers, it seems to me. And also, when you go through somebody's drawers, you don't find something. You leave it all there. Right here, they take it back. They have somebody looking at it all. I understand it's sealed. But where is it? It's sealed in the United States government's office. Right? And it's still there, as I understand it. Your Honor, my understanding is that once the case is resolved, it is destroyed. And that the original disk is maintained solely for the purpose of laying foundation. And if there was ever a challenge to the authentication, the authentication. The other reason why, particularly in reactive cases, we seek to have the original at one point is because there's an argument under Rule 16 that to the extent it includes a defendant's statements, they are entitled to those in discovery. And so our standard practice, and part of why I think there was some confusion initially with the defense, is that we gave them two disks. We gave them the disk that contained all of the originals and an abundance of caution under Rule 16. We also made it clear when there was confusion that we no longer had access to all of that information. We only had access to what was on the second disk, which was the 100 documents that were seized as responsive to the scope of the attachment B. Does that address the court's question on that issue? Okay, let me just go back to one other thing, because I'm still very troubled by the closing argument. I'm not anxious. Legally troubled by the closing argument. Well, I'll apologize to you for using harsh language. Anyway. But, you know, you get up there and you act like you own the courtroom and you interrupt the judges. You're a very aggressive person, and I can see how getting up there in front of a jury, you can be convincing. You can pound them. I see that, and I don't know that that's all necessary. Is it? Anyway, if I could finish my last question. I hope it's my last question. I now found more of what I was saying. You want to answer that question? I want to keep everybody on this panel as happy as possible, and I'm not quite sure how to do that at this moment. Oh, well, you're sure doing it. Pardon? You're sure doing it, yeah. Oh, I don't think anyone would accuse me of keeping you happy, Judge Gregerson. I just want to try and address. I'm not interested in happiness. I'm interested in putting on a fair trial. That's what's important. If you put on a fair trial, you'll get the result that's just. That's my main concern. Your Honor, I want a fair trial as well, and the only food for thought I. . . Well, let me just address Judge Berzon's question. I'm sorry. So. . . Well, you can finish what you were going to tell me. What are you going to tell me? I want to make sure I address all the legal issues, so let me make sure I answer Judge Berzon's question. You were in the middle of a sentence talking to me. I know this is very frustrating for both of you. I'm happy to hold my thoughts until you've had an opportunity to address yours, and I know Judge Berzon has mentioned a few times wanting to complete her question, so I'll return to yours as soon as I can make sure I've addressed her question about this case, which is obviously separate and apart from my person, which has inadvertently somehow become part of this record. Yeah, okay. So the question is this. We had a dialogue way back about whether this was an accurate statement, and you read me something from the record which to me is inconsistent with it being an accurate statement. Here is my face. She said delete the, and this is in the opening closing argument. Here is my Facebook account password and access to delete the evidence. Why did she want him to delete the evidence? As she said, she wanted to delete the evidence of her drug smuggling. Did she ever say that? I'm sorry. Did she ever say that she wanted to delete the evidence of her drug smuggling? No. No. Okay. So are there any other questions that you'd like me to address? Thank you. Very briefly, Your Honors. The government can strike hard blows, but here it struck valid blows. Ms. Flores testified that she brought marijuana to Mexico in her purse. She did not say she smuggled drugs. She never used that language, but that was repeatedly characterized by the prosecutor as admissions. The prosecutor argued that she was very clear about talking about which directions the drugs were going, from Mexico to the United States, but that's simply not true, and that's clear from her repeated use of the word between. So suppose we agree with you. What's the standard that we apply? Because there was no objection. Do we look at whether it was plain error or to, I mean, I don't know what, or do we look at the weight of the evidence to see whether there was overwhelming evidence of guilt that excuses the misstatements? Yes, Your Honor. I believe the standard would be cumulative error to look at the error that pervaded the entire trial, the strength of the case, which here was not very strong, and whether any curative instructions were given, which here there were not. Were they asked for? They were not, Your Honor. No. The prosecutor said there was no cases on point about characterizing the testimony as it did. I would point the Court to the United States v. Margano, where it says even where it's reasonable for a prosecutor to argue inferences from the record, the prosecutor's... That case is currently pending in re-hearing. I'm sorry? That case is currently pending in re-hearing. Okay. I was not aware of that, Your Honor. But I think the standard still applies, that the prosecutors cannot, in closing argument, flatly mistake the testimony so as to make it appear that the permissible inference was affirmatively stated by witness. And there, that was a witness, a defense witness, but not the defendant herself, which is what it was in this case, mistaking the testimony of the defendant herself, whose testimony was critical at trial. Evidence... Did she testify at both trials? She did, Your Honor. And very briefly, just with respect to the warrant, the warrant was overbroad not only temporarily, but also in the types of crimes that looked for it. It authorized a search for a general Federal conspiracy. So it was not sufficiently limited. And the standards in the application, the affidavit for the warrant, which were procedures for electronically collected materials, did not have any limitations whatsoever. It gave the government unfettered discretion to go through her Facebook records and look for anything amounting to a general conspiracy. And on that, unless the Court has additional questions for me, I would submit... But this is the problem. What was actually... Well, nothing was actually introduced. And the two e-mails that were used in cross-examination were directly on point. So what do you do in a case like that with regard to... What would you suppress? I don't believe the questions were... The two that were introduced at trial were directly on point. Timing-wise, it didn't make sense that... Warrant. I mean, they had to do with her... They dealt with it the particular day of the offense, and they dealt with her relationship with marijuana on that day. And I find it hard to believe that they would have been beyond the scope of any legitimate search. So what do we do about... This is what I find difficult. I mean, meanwhile, they have gone through gazaz of other stuff that has nothing to do with any of this. But how does that relate to an exclusionary rule? Remedy. It doesn't seem like it does very well. Your Honor, I would argue that the remedy is suppression for an overbroad search. And here, that was Ms. Flores' motion to suppress the search at the time after it happened. It just... That's a good question that Your Honor presents, given that very few materials were... Because it's hard to see how the suppression of the evidence remedy deals with this kind of thing. Well, it would prevent an overbroad search and convince the government to narrowly request what it's searching, the things to be searching in the time period that is authorized for that search. Otherwise, nothing is safe. Thank you for your time. Thank you. The matter will stay on Sunday.
judges: Pregerson, Wardlaw, Berzon